UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

HOLLIE GARRETT,

                Petitioner,

     v.

R. GROUNDS,

                Respondent.

No.  2:14-cv-1973 JAM DB P

FINDINGS AND RECOMMENDATIONS

     Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges a judgment of conviction entered against him on August 26, 2011 in the Sacramento County Superior Court on one count of forcible oral copulation of a child and four counts of forcible oral copulation of a child in concert with another.  In his original petition, petitioner seeks federal habeas relief on the grounds that: (1) none of his convictions are supported by substantial evidence; (2) the judgment must be reversed to remedy the jury's exposure to evidence the victim offered to take a polygraph test; (3) his trial counsel was ineffective for failing to object to the polygraph evidence; (4) the trial court erred in instructing the jury regarding aider and abettor liability; (5) the prosecutor committed misconduct by advising the jury that an aider and abettor is "just as guilty as" the perpetrator; (6) his convictions must be reversed because the DNA evidence upon which they are based is

////

1

unreliable; and (7) his trial counsel was ineffective in failing to move for a separate trial or separate jury.[1]

Recently, petitioner filed a new habeas petition in this court alleging claims that the trial court violated his right to a fair and impartial jury when it denied his Batson/Wheeler motion and his appellate counsel was ineffective for failing to raise this issue on appeal. The court construed petitioner's new filing as a motion to amend his current petition. Upon careful consideration of the record and the applicable law, the undersigned recommends that petitioner's motion to amend be denied and his application for habeas corpus relief be denied.

**FACTUAL BACKGROUND**

In its unpublished memorandum and opinion affirming petitioner's and co-defendant Hamilton's judgments of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual and procedural summary:

> In mid-July 2000, 14–year–old C.G. went to the movies with her boyfriend Cameo, a guy named "Chris," and her neighbor. During the movie, C.G. orally copulated Cameo. A couple of days later, on the evening of July 18, Chris showed up at C.G.'s mother's apartment and invited C.G. to watch a movie at his grandmother's home. As C.G. walked to the car with Chris, she noticed there was another person inside the car. Once inside the car, she saw Chris wave to two occupants of another car, who then followed them to a nearby park. When they arrived, C.G. asked Chris why they were at the park and not at his grandmother's house, and he told her not to worry, and that they would go to his grandmother's later. C.G. and the four men sat at a table in front of the restroom. All of the men were African–American and were in their late teens or early twenties.
>
> While they were sitting at the table, Chris told C.G. that he needed to talk to her, took her by the wrist, and led her into the restroom. Once inside, Chris stood in front of the door, pulled his pants down, pushed C.G. down, and inserted his penis in her mouth. She slapped his legs and attempted to stand up, but he "kept pushing it." At that

---

[1] At the end of the petition, petitioner includes a section entitled "Petitioner Joins in Co-defendant's Petition for Writ of Habeas Corpus Arguments." He then states, "Petitioner joins in co-defendant's Petition for Review arguments which Petitioner believes will apply equally to Petitioner." (ECF No. 1 at 60.) Petitioner does not identify which of his co-defendant's arguments he believes apply to him nor does he include any further argument in his petition. Even considering the court's obligation to liberally construe pro se filings, this is not sufficient to allege additional claims. The court will address the seven claims identified, and argued, in the petition.

point, she "started getting scared because in the bathroom it was real dark." After several minutes, one of the three other men from the table entered the restroom. She could not recall which one.

The second man pulled out his penis and began to "play" with himself. At that point, Chris and the second man "were over [C.G.] with their penises out." At some point Chris ejaculated, moved to the side, and the second man placed his penis in C.G.'s mouth. C.G. did not feel free to leave because Chris and the second man were holding her. She attempted to resist the second man, but he and Chris laughed and made derogatory comments directed at her. As C.G. was being forced to orally copulate the second man, Chris left for a while. C.G. was not sure whether the second man ejaculated.

When Chris returned, the other two men from the table were with him. At that point, there were "four people surrounding" C.G. in the restroom. She was scared. She tried to leave, but they would not let her. She did not know what they were going to do, so she just complied. A third man put his penis in her mouth while the other men laughed. She attempted to push the third man away. One of the men stopped after she slapped at his legs, but she could not recall which one. At trial, C.G. testified that she was sure she was forced to orally copulate three of the men but was unsure whether she was forced to orally copulate the fourth.

When the men finished forcing C.G. to orally copulate them, all four men stood over her and masturbated as she squatted down on the floor, and at least three of them ejaculated on her. At some point, Chris told the other men, "Her mom's on us. So we got to be cool," or something like that.

When the men were through, they allowed C.G. to leave the restroom. When she left, she rolled around on the grass in an attempt to get the semen off her clothes and hair. The men left in their respective cars. As they drove away one man shouted, "[T]hat's what you get for being so trusting, bitch," and another flipped her off. C.G. estimated that she was in the restroom for about an hour.

After rolling in the grass, C.G. began walking to her mother's apartment. On the way, she ran into a man who asked her if she was okay, and when she responded that she was not, he drove her home. When C.G. returned home, her hair and clothing were "all messed up" and she was crying. She told her mother she had been "violated," and that "they" had taken her to a park, drug her into a restroom, and "performed sexual acts on her." Her mother summoned the police and C.G.'s brother's girlfriend. The girlfriend arrived about five minutes later, before the police. C.G. was distraught and crying. C.G. told the girlfriend that she was in the restroom with some boys, and they made her perform oral sex on them.

Sacramento Police Officer Darrel Johnson was dispatched to C.G.'s mother's apartment at 9:40 p.m. When he arrived, C.G. was sitting on the floor with her hands covering her face and crying. She had

3

scratches on her shoulder and white stains on the right thigh and left knee areas of her pants. C.G. told Johnson that she had gone to a park with "Chris, and another suspect who met up with another group of male blacks in another car," and she was forced to orally copulate "[a]ll four suspects." She also told him "that two of the suspects began rubbing their penises in their hands and ejaculated on her." Johnson transported C.G. to U.C. Davis Medical Center for an evidentiary exam.

C.G. arrived in the emergency department at 11:00 p.m. and was examined for approximately two and one-half hours by Sheridan Miyamoto, a nurse practitioner with the Child and Adolescent Resource and Evaluation Diagnostic and Treatment Center. When Miyamoto asked her what had happened, C.G. stated that "she had gone to the park with a male she called Chris and some of his friends, and ... he had taken her into a bathroom and forced oral copulation on her. Then his friends came in and all of them forced oral copulation on [her]." C.G. also told Miyamoto that there were four men in the bathroom and that "all four of them began oral copulation and two actually stopped once she struck out at them and hit them." When taking notes during her examination, Miyamoto detailed the perpetrators by number so she could keep them straight. C.G. told Miyamoto that "number one and number two ejaculated and wouldn't stop despite [C.G.'s] protests. Number three and number four began to do oral copulation but stopped when [C.G.] hit them." She further indicated that three of the four men "ejaculated on to her body" after masturbating. Miyamoto collected C.G.'s clothing and scanned her body with a black light, looking for "any kind of a dried secretion on her skin." Miyamoto took samples of the dried secretions found on C.G.'s skin and cuttings from her hair. Miyamoto also collected C.G.'s clothing, placing each piece in a separate bag. The samples and the clothing then were sent to the Sacramento County crime lab.

Initially, the police were unable to identify any of the men, and C.G. "gave up" and attempted to block the incident from her mind. Eight years later, in 2008, she was contacted by Retired Reserve Officer Peter Willover, who works "cold" cases for the Sacramento Police Department. Willover advised C.G. that there had been a DNA "match" as to one of the men who assaulted her but did not tell her the individual's name. He asked her to look at a photographic lineup, and when she did so, she pointed to Hamilton. She told Willover, "I know this guy, but it's not [from] that. The guy, Chris, looks similar to him." C.G. later explained that her cousin had introduced her to Hamilton in 2004 or 2005, the two became friends and were intimate a couple of times. At no point during the time she was intimate with Hamilton did she think he was the person she knew as "Chris" from the park. She cried when she learned that the DNA found on her following the incident was a match for Hamilton and said she could not believe that Chris and Hamilton was the same person. At trial, C.G. identified Hamilton as the person she formerly knew as "Chris."

Officer Willover interviewed Hamilton on November 6, 2008, while Hamilton was in custody at Rio Consumnes Correctional

Center. Willover explained that he worked cold cases and that Hamilton's name "ha[d] come up as a suspect in a sexual assault that occurred back in 2000, involving a 14–year–old girl in a park rest room at Wood Park on Bodine Circle." Willover also showed Hamilton a photograph of the victim, whom Hamilton immediately recognized as C.G. Hamilton said he did not "recall any of that happening" but that he did recall "getting with" C.G. within the last year. He denied ever "raping" or "sexually assaulting" C.G. and stated that "[e]ight years ago I didn't even talk to [C.G.]." He denied ever having sex with C.G. in a park restroom and did not recall ever having sex with her when she was 14. He told Willover he "never forced that girl to do a damn thing" and that she is a "fucking liar." He also stated that "if it did happen, it happened, and she did it willingly." Finally, he denied ever going by the name "Chris."

Following the interview, Hamilton telephoned his "baby momma" Jasmine and told her that earlier that morning the police told him "this bitch [C.G.] said I raped her" and that it was "eight years ago" with "three other guys." Hamilton also said that he did not "remember dealing with [C.G.] in no ... 2000 period." During the conversation, Hamilton and Jasmine repeatedly referred to C.G. as a "bitch," and Jasmine said she wanted to kill C.G. After a while, Jasmine telephoned C.G., and Jasmine, C.G., and Hamilton engaged in a three-way conversation. Hamilton asked C.G. if he raped her eight years earlier, and C.G. responded, "You didn't rape me." C.G. told Hamilton that he and "three other dudes took me to that park, and you all had me give you ass and then you all left me up there." Hamilton responded, "I don't even remember that bro." C.G. explained, "I didn't know you. I knew you as Chris like but I didn't [put] those two together." Hamilton insisted he did not remember the incident in the restroom, and C.G. explained that "two days before we had went to the movie" with Cameo and C.G.'s neighbor. C.G. told Hamilton, "I don't know how you couldn't remember it's you and three other dudes. [¶] ... [¶] It done messed me up share." Hamilton asked C.G. if they had been drunk because he did not remember any such incident. Hamilton said that he remembered the movie with Cameo, but "that's the only thing I remember. I swear to God. So I'm like, was we drunk?" He also asked C.G. if he forced her to do anything, and she responded that she "did not want to do that." Eventually, Jasmine hung up on C.G., reminding Hamilton that his lawyer had told him not to talk to anyone.

In March 2010, Officer Willover received information that there had been a second DNA "hit" from the evidence collected from C.G. in 2000. He was informed that the DNA was a match for Garrett. Prior to that time, Garrett's name had never come up in Johnson's investigation. C.G. did not recognize Garrett from the incident or anywhere else.

Hamilton's DNA profile was found in samples taken from C.G.'s hair, tank top, and jeans. Garrett's DNA profile was found in samples taken from C.G.'s tank top, left arm, back, and jeans. DNA from a third unidentified male was also found. Hamilton's DNA

profile is estimated to occur at random among unrelated individuals in approximately one in two quintillion of the African–American population, one in three sextillion of the Caucasian population, and one in eleven sextillion of the Hispanic population. Garrett's DNA profile is estimated to occur at random among unrelated individuals in approximately one in one sextillion of the African–American population, one in a hundred sextillion of the Caucasian population, and one in two hundred and seventy sextillion of the Hispanic population.

People v. Hamilton, Nos. C068430, C069220, 2013 WL 3961167, at *2-4 (Cal. Ct. App. July 31, 2013).[2]

**PROCEDURAL BACKGROUND**

The jury rendered its verdict against petitioner on March 25, 2011. (3 RT 681.[3]) The California Court of Appeal for the Third Appellate District ("Court of Appeal") denied petitioner's appeal on July 31, 2013. Petitioner filed a petition for review with the California Supreme Court. (LD 5.) On November 13, 2013, the California Supreme Court denied review. (LD 6.) It does not appear that petitioner sought certiorari review in the United States Supreme Court or that he filed any state habeas petitions prior to filing his federal petition here.

Petitioner filed his petition here on August 15, 2014. (ECF No. 1.) On December 2, 2014, respondent filed an answer. (ECF No. 11.) On August 31, 2015, petitioner moved to stay the petition to permit him to exhaust new claims. (ECF No. 17.) On June 23, 2016, the court denied petitioner's motion. (ECF Nos. 34, 39.) The court recognized that petitioner's new claims were untimely. (ECF No. 34 at 4.) The court noted that petitioner could attempt to amend his petition to include these claims after they had been exhausted, but stated that it "could not conceive of how petitioner" could do so because "[b]ased on the limited information he has provided in his motion, petitioner's claims do not appear as though they could share any 'common core of operative facts' with his original exhausted claims." (Id.) The court held that petitioner failed to

////

<hr/>

[2] A copy of the Court of Appeal's opinion can also be found in an attachment to respondent's answer. (See ECF No. 11 at 32-57.)

[3] On February 23, 2015, respondent lodged a copy of the state court record. (See Notice of Lodging (ECF No. 14).) "RT" stands for the Reporter's Transcript. "LD" indicates the lodged document number provided by respondent.

establish good cause for a stay of these proceedings.  (See id. at 3-4.)  On December 12, 2016, petitioner filed his traverse.

Petitioner filed a new habeas action with this court on May 2, 2017.  The court construed petitioner's filing as a motion to amend the present petition.  (ECF No. 51.)  Respondent opposes the motion.  (ECF No. 55.)

## MOTION TO AMEND

Petitioner seeks to amend his petition to include two claims.  In his first new claim, petitioner contends his right to a fair and impartial jury was violated when the trial court denied his Batson/Wheeler motion disputing the prosecutor's successful challenges to the only three African American members of the jury pool.  In his second claim, petitioner contends his appellate counsel was ineffective for failing to raise the Batson/Wheeler issue on appeal.  (ECF No. 51 at 5, 7.)

Rule 15(a) of the Federal Rules of Civil Procedure governs amendment of pleadings in federal habeas corpus.  28 U.S.C. § 2242; Mayle v. Felix, 545 U.S. 644, 649 (2005).  Pursuant to Rule 15(a)(2), a pleading may be amended with leave of court.  In determining whether to grant leave to amend pursuant to Rule 15(a)(2), futility alone may justify the denial of leave to amend. Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995) ("futility of an amendment can, by itself, justify the denial of a motion for leave to amend because the proffered amendments would be nothing more than an exercise in futility"); see also Novak v. United States, 795 F.3d 1012, 1020 (9th Cir. 2015) (citing Bonin, 59 F.3d at 845).  To avoid the futility bar, petitioner must show relief on his new claims is at least possible.  If the claims are barred by the statute of limitations, then relief on the new claims is not possible and amendment would be futile.  See Platt Elec. Supply, Inc. v. EOFF Elec., Inc., 522 F.3d 1049, 1060 (9th Cir. 2008); Naas v. Stolman, 130 F.3d 892, 893 (9th Cir. 1997).

Petitioner's new claims were filed outside the statute of limitations.  Federal habeas claims must be filed within one year of the conclusion of direct review.  28 U.S.C. § 2244(d)(1).  Under subsection (d)(1)(A), the limitations period runs from the time a petition for certiorari to the United States Supreme Court was due, or, if one was filed, from the final decision by that court.

Lawrence v. Florida, 549 U.S. 327, 339 (2007). The California Supreme Court denied review on November 13, 2013. Any petition for a writ of certiorari was due ninety days later. Maes v. Chavez, 792 F.3d 1132, 1133 (9th Cir. 2015). That ninety-day period expired on February 11, 2014. The one-year limitations period commenced running the following day, on February 12, 2014. See Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001) (commencement of limitations period excludes last day of period for seeking direct review, by application of Fed. R. Civ. P. 6(a)). It expired one year later on February 12, 2015.

Petitioner filed his motion to amend the petition on May 2, 2017, well after the expiration of the limitations period. Where a petitioner has filed a timely petition and then amends to add new claims, but does so after expiration of the statute of limitations, those new claims are only timely if they "relate back" to the claims in the original timely petition. See Mayle v. Felix, 545 U.S. 644, 654-55 (2005). In order for claims to relate back, they must be "tied to a common core of operative facts." Id. at 664. Simply arising out of the same "trial, conviction, or sentence" is insufficient. Id. A claim "does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Id. at 650.

Petitioner's new claims are based on the racial composition of the jury, the trial judge and prosecutor's actions during voir dire, and the conduct of appellate counsel. The original claims allege the following: (1) none of petitioner's convictions are supported by substantial evidence; (2) the judgment must be reversed to remedy the jury's exposure to evidence the victim offered to take a polygraph test; (3) petitioner's trial counsel was ineffective for failing to object to the polygraph evidence; (4) the trial court erred in instructing the jury regarding aider and abettor liability; (5) the prosecutor committed misconduct by advising the jury that an aider and abettor is "just as guilty as" the perpetrator; (6) petitioner's convictions must be reversed because the DNA evidence upon which they are based is unreliable; and (7) his trial counsel was ineffective in failing to move for a separate trial or separate jury. The new claims bear no relationship, either in time or type, to the claims in the original petition. Accordingly, petitioner's new claims do not relate back to the claims in the original petition and permitting petitioner to amend his petition

8

would be futile.  Petitioner's motion to amend will be denied.  Below, the court addresses the seven claims raised in the original petition.

**STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision.  Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'"  Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be

accepted as correct." Id. at 1451. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06). "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." (Internal citations and quotation marks omitted.)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

There are two ways a petitioner may satisfy subsection (d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012). He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." Id. (citing Taylor v. Maddox, 366

10

F.3d 992, 999-1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process may be deficient and the state court opinion may not be entitled to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

The second test, whether the state court's fact-finding process is insufficient, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised."). For the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the

11

reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 133 S. Ct. 1088, 1091 (2013).

A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853 (citing Delgado v. Lewis, 223 F.3d 976, 981 (9th Cir. 2000)). This court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." Richter, 562 U.S. at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Richter, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

////

12

habeas court must review the claim de novo.  <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso v. Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006); <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056 (9th Cir. 2003).

**PETITIONER'S CLAIMS**

Petitioner seeks federal habeas relief on the grounds that:  (1) none of his convictions are supported by substantial evidence; (2) the judgment must be reversed to remedy the jury's exposure to evidence the victim offered to take a polygraph test; (3) his trial counsel was ineffective for failing to object to the polygraph evidence; (4) the trial court erred in instructing the jury regarding aider and abettor liability; (5) the prosecutor committed misconduct by advising the jury that an aider and abettor is "just as guilty as" the perpetrator; (6) his convictions must be reversed because the DNA evidence upon which they are based is unreliable; and (7) his trial counsel was ineffective in failing to move for a separate trial or separate jury.  Each claim is addressed below.

**I.      Insufficient Evidence**

Petitioner first claims that there was insufficient evidence for the jury to convict him of forced oral copulation or forced oral copulation in concert.   Petitioner bases his argument primarily on the victim's testimony that she was only certain that three of the four men forced her to orally copulate them.  (Pet. (ECF No. 1 at 30-37).)

**A.   Applicable Legal Principles**

**1.    Standards for Sufficiency of the Evidence Claim**

The United States Supreme Court has held that when reviewing a sufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  <u>Id.</u> at 326.  State law provides "for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of

federal law." <u>Coleman v. Johnson</u>, 566 U.S. 650, 32 S. Ct. 2060, 2064 (2012) (quoting <u>Jackson</u>, 443 U.S. at 324 n.16).

The Supreme Court recognized that <u>Jackson</u> "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." <u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011) (per curiam). Moreover, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" <u>Id.</u> (citing <u>Renico v. Lett</u>, 559 U.S. 766 (2010)). The Supreme Court cautioned that "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." <u>Id.</u>

### 2. State Law Standards

California Penal Code §288a(c)(2)(A) provides that a conviction of forcible oral copulation requires proof that the defendant committed "an act of oral copulation when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ."

Penal Code §288a(d)(1) defines the crime of forcible oral copulation in concert: "Any person who, while voluntarily acting in concert with another person, either personally or by aiding and abetting that other person, commits an act of oral copulation (A) when the act is accomplished against the victim's will by means of force or fear of immediate and unlawful bodily injury on the victim or another person . . . ."

The California Supreme Court has held that a defendant may be guilty as an aider and abettor if he "act[s] with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." <u>People v. Beeman</u>, 35 Cal. 3d 547, 560 (1984); <u>see</u> <u>People v. McCoy</u> 25 Cal. 4th 1111, 1117-18 (2001).

14

## B.  State Court Decision

The Court of Appeal rejected petitioner's arguments on appeal, reasoning as follows:

> ### Garrett's Convictions Are Supported by Substantial Evidence
>
> Garrett first contends that "there was no proof of forcible oral copulation by [him]," or that he "acted in concert with anyone to commit an act of oral copulation against [C.G.'s] will." He is mistaken.
>
> In addressing whether there is sufficient evidence to support Garrett's convictions, we view the entire record in the light most favorable to the judgment and presume in support of the judgment the existence of every fact that the jury reasonably could deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Golde* (2008) 163 Cal.App.4th 101, 108.)
>
> Viewed in the light most favorable to the judgment, the evidence shows that on the night in question, C.G. was forced to orally copulate four men in a public restroom. Thereafter, the same four men stood over her masturbating, and at least three of them ejaculated on her. Garrett's DNA was found in samples taken from C.G.'s left arm, back, and clothing on the night in question. Moreover, Garrett was one of three of the men who waited outside C.G.'s apartment when Hamilton picked her up and then reconvened, along with C.G., at a nearby park. While C.G. was in the restroom being assaulted, Garrett was either inside the restroom or at a table just outside.
>
> On this record, a jury reasonably could conclude that Garrett forced C.G. to orally copulate him, and that he intended to and did aid and [abet] the other men in forcing C.G. to do the same to them. Even assuming Garrett was the last man to enter the restroom, the jury reasonably could conclude that his presence at the table just outside the restroom aided the others by, among other things, deterring C.G. from attempting to flee.
>
> Garrett's convictions for forcible oral copulation and forcible oral copulation in concert are supported by substantial evidence.

Hamilton, 2013 WL 3961167, at *8-9.

## C.  Analysis of Sufficiency of the Evidence Claim

### 1.  Oral Copulation Conviction

Examining the evidence in the light most favorable to the prosecution, a reasonable jury could have found petitioner guilty of oral copulation beyond a reasonable doubt.  While petitioner focuses on the victim's lack of certainty at trial that a fourth man forced her to engage in oral

////

copulation, testimony at trial showed that, just hours after the crimes, the victim told both a police officer and a health care worker that all four men forced her to do so.

Darrel Johnson testified that in 2000 he was a police officer with the Sacramento Police Department. (2 RT 332.) On the night of July 18, 2000, he responded to a call about a possible rape and picked up the victim from her mother's home. (2 RT 332-33.) The victim told Johnson that all four men had forced her to orally copulate them. (2 RT 334-35.) Johnson took the victim to the U.C. Davis Medical Center for an exam.

Sheridan Miyamoto testified that in the year 2000 she was a nurse practitioner who conducted forensic exams for the Child and Adolescent Resource and Evaluation Diagnostic and Treatment Center (the "CARE Center") at the U.C. Davis Medical Center. At that time children were admitted to the CARE Center when there were concerns about physical abuse, sexual abuse, or neglect. (1 RT 275-76.) On July 18, 2000, Miyamoto conducted a sexual assault examination of the victim in this case. (1 RT 279.) The victim told Miyamoto that all four men had forced her to orally copulate them. (1 RT 282.)

Petitioner argues for the first time in his traverse that the testimony of Johnson and Miyamoto was hearsay. Claims and arguments improperly raised for the first time in a reply or a traverse need not be addressed. See Delgadillo, 527 F.3d at 930 n.4; Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994). However, the hearsay issue was raised by co-defendant Hamilton and addressed by the Court of Appeal. The Court of Appeal held that the evidence was admissible under the prior inconsistent statement exception to the hearsay rule. Hamilton, 2013 WL 3961167, at *5-6. The state court did not address due process implications of admission of the evidence. Whether or not that issue is properly before this court, it does not merit relief.

To establish a due process violation, petitioner must show the testimony was so unreliable that its admission rendered his trial fundamentally unfair. See Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995). Petitioner relies solely on the evidence's hearsay nature. He makes no attempt to argue that the evidence was not reliable. There is nothing inherently unreliable about statements made by a victim to a police officer and health care worker shortly after the crime.

////

16

1    Accordingly, petitioner's objection to the admission of the testimony of Johnson and Miyamoto

2    is groundless.

3        DNA evidence showed that petitioner was one of the four men involved.  Semen samples

4    with DNA matching petitioner's DNA profile were found in five locations on the victim's

5    clothing (her tank top, her left arm, her back, and two places on her jeans).  (2 RT 458.)

6    Petitioner's argument that the reliability of the DNA evidence was "troubling" is unconvincing.

7    Petitioner raises this issue as a separate claim, which is discussed below.  The DNA evidence

8    identifying petitioner was uncontested – both defense and prosecution experts agreed.

9    Petitioner's only argument is that the experts' disagreement about one aspect of the DNA

10   evidence identifying Hamilton gives rise to concern that all DNA evidence is unreliable.  As

11   discussed below, a reasonable jury could well have accepted the DNA evidence identifying

12   petitioner.  In sum, the state court's rejection of petitioner's claim of insufficient evidence for the

13   conviction for forced oral copulation was not contrary to, or an unreasonable application of,

14   clearly established federal law.

15                    **2.    Aider and Abettor Liability**

16       The primary focus of this argument is that there was no proof petitioner was in the bathroom

17   during a time one of the other perpetrators forced the victim to orally copulate him.  However,

18   petitioner does not address the Court of Appeal's determination that even if petitioner was outside

19   during that time, the jury could have determined that he was there to prevent the victim from

20   attempting to flee.  The victim told witnesses Johnson and Miyamoto, and testified at trial, that

21   four men were with her at the park, four men were in the bathroom with her, and the same four

22   men left together.  (1 RT 131-32, 142, 147, 149-50.)  DNA evidence identified petitioner as one

23   of those four men.

24       As described above, when determining whether sufficient evidence supported the verdict, the

25   court must presume that jurors drew all inferences and resolved any conflicting evidence in favor

26   of the prosecution.  See Jackson, 443 U.S. at 326.  Petitioner fails to show that no reasonable juror

27   could have concluded that petitioner knew the others intended to force the victim to orally

28   copulate them and intended to aid their doing so.  This conclusion is particularly compelling

1    where the jury found petitioner was also a perpetrator.  Petitioner's argument does not establish

2    that the state court's determination that there was sufficient evidence to support the verdicts for

3    oral copulation in concert was unreasonable.

4    **II.      Admission of Victim's Testimony that She Offered to take a Polygraph**

5        Petitioner's next argument is that the admission of the victim's testimony that she offered to

6    take a polygraph test violated petitioner's due process rights because the victim's credibility was

7    an important issue at trial.  (Pet. (ECF No. 1 at 37-44.)  The state Court of Appeal described the

8    factual basis for this claim as follows:

9            During his cross-examination of C.G., Hamilton's trial counsel
             stated to C.G., "In fact, you wanted to take a lie detector test" when
10           Officer Willover indicated that he did not believe her when she said
             that she did not know Hamilton from the incident in the restroom,
11           and C.G. responded, "Yeah." Garrett did not object to the
             questioning or request an admonition or curative instruction.
12

13   Hamilton, 2013 WL 3961167, at *9.

14       The state court held that petitioner procedurally defaulted this claim because the testimony

15   was admitted without objection.  The state court went on, however, to address the merits and find

16   admission of the testimony harmless.

17       As a general rule, "[a] federal habeas court will not review a claim rejected by a state court 'if

18   the decision of [the state] court rests on a state law ground that is independent of the federal

19   question and adequate to support the judgment."  Walker v. Martin, 562 U.S. 307, 315 (2011)

20   (quoting Beard v. Kindler, 558 U.S. 53, 55 (2009)); see also Maples v. Thomas, 565 U.S. 266,

21   280 (2012).  However, a reviewing court need not invariably resolve the question of procedural

22   default prior to ruling on the merits of a claim.  See Lambrix v. Singletary, 520 U.S. 518, 524-25

23   (1997); see also Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues

24   are not infrequently more complex than the merits issues presented by the appeal, so it may well

25   make sense in some instances to proceed to the merits if the result will be the same."); Ayala v.

26   Chappell, 829 F.3d 1081, 1096 (9th Cir. 2016) (citing Franklin, 290 F.3d at 1232).  Thus, where

27   deciding the merits of a claim proves to be less complicated and time-consuming than

28   ////

adjudicating the issue of procedural default, a court may exercise discretion in its management of the case to reject the claim on its merits and forgo an analysis of procedural default.

Under the circumstances presented here, this court finds that petitioner's claims of error in the admission of evidence can be resolved more easily by addressing them on the merits.

### A. Applicable Legal Principles

A federal writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" Mancuso v. Olivarez, 292 F.3d 939, 956 (9th Cir. 2002) (quoting Barefoot v. Estelle, 463 U.S. 880, 899 (1983)). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Evidence must "'be of such quality as necessarily prevents a fair trial'" for its admission to violate due process. Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th Cir. 1986)).

Notwithstanding the above, the Ninth Circuit has observed that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). Therefore, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Id.

### B. State Court Decision

The state Court of Appeal held that the failure to object at trial forfeited this issue on appeal. The court nonetheless examined the merits and determined that any error was harmless.

Defendant's Failure to Object to Evidence That C.G. Offered to
Take a Polygraph Test Forfeited the Issue on Appeal, and In Any
Event, the Admission of Such Evidence Was Harmless

Garrett next contends "[t]he judgment should be reversed to remedy [the jury's] erroneous exposure to evidence that [C.G.] offered to take a polygraph test." We are not persuaded.

During his cross-examination of C.G., Hamilton's trial counsel stated to C.G., "In fact, you wanted to take a lie detector test" when Officer Willover indicated that he did not believe her when she said that she did not know Hamilton from the incident in the restroom, and C.G. responded, "Yeah." Garrett did not object to the questioning or request an admonition or curative instruction.

In *People v. Leonard* (2007) 40 Cal.4th 1370, 1408, our Supreme Court found that "[a]lthough the portion of defendant's statement in which he refused to take the [polygraph] test was subject to exclusion upon proper objection (Evid. Code, § 351.1), the defense did not object, and the prosecutor was free to comment on it once it was admitted into evidence."[fn]

Here, Garrett forfeited his challenge to the admission of evidence C.G. wanted to take a polygraph test by failing to object to the questioning or request an admonition or curative instruction. (*People v. Leonard*, supra, 40 Cal.4th at p. 1408.) Even assuming for argument's sake that the issue was preserved on appeal, the passing reference to C.G.'s desire to take a polygraph test was harmless. Garrett acknowledges that C.G.'s desire to take a polygraph test was not mentioned during closing arguments. Moreover, C.G. wanted to take a polygraph test to establish her credibility concerning an issue that had little, if any, bearing on Garrett's guilt—whether she recognized Hamilton from the restroom incident. Under these circumstances, we find the passing reference to C.G.'s desire to take a polygraph test was harmless under any standard. (*See Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711]; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

> [Fn] Evidence Code section 351.1, subdivision (a) provides in pertinent part: "Notwithstanding any other provision of law, ... any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, ... unless all parties stipulate to the admission of such results."

Hamilton, 2013 WL 3961167, at *9.

## C. Analysis of Admission of Evidence Claim

Petitioner contends that the victim's credibility was a critical issue argued by attorneys for both defendants at trial. According to petitioner, "[e]vidence that [the victim] cried and offered to submit to a polygraph examination when her truthfulness was questioned undoubtedly influenced the jurors' determination of petitioner's fate in the prosecution's favor." (Pet. (ECF No. 1 at 40).) Petitioner then goes on to outline his argument set out above – that there was

nothing besides the questionable DNA evidence that connected him to the crime.  Petitioner

argues that admission of the victim's testimony that she volunteered to take a polygraph should be

considered cumulatively with the other errors to find that he was denied a fundamentally fair trial.

The state appellate court's rejection of petitioner's due process claim here does not support a

grant of federal habeas relief under AEDPA because a California trial court's admission of

evidence that a witness volunteered to take a polygraph does not violate any principle of clearly

established federal law.  Further, any error in admitting this challenged evidence did not have "a

substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

Abrahamson, 507 U.S. 619, 637 (1993); see also Penry v. Johnson, 532 U.S. 782, 793-96 (2001).

As the Court of Appeal described, the victim stated that she would take a polygraph

examination only in response to an officer's disbelief that she did not recognize Hamilton as one

of her assailants when she had had a relationship with Hamilton only two years after the attack.

The victim's identification of Hamilton bore no relevance to the DNA identification of petitioner.

Moreover, the effect of the victim's one-time offer to take a polygraph on that issue can hardly be

said to have bolstered her credibility with respect to all of her testimony at trial.  The prosecutor

did not rely on the testimony to support the victim's credibility.  In fact, the testimony regarding

the offer to take the polygraph was not mentioned again.

The Court of Appeal's holding that admission of evidence that the victim offered to take a

polygraph was harmless was not contrary to, or an unreasonable application of, clearly

established federal law.

**III.     Ineffective Assistance Of Counsel**

Petitioner claims his trial attorney acted unreasonably when he failed to object to the

admission of evidence regarding the victim's offer to take a polygraph.  (Pet. (ECF No. 1 at 40-

44).)  To succeed on a claim of ineffective assistance of counsel, a petitioner must show that (1)

his counsel's performance was deficient and that (2) the "deficient performance prejudiced the

defense." Strickland v. Washington, 466 U.S. 668, 687 (1984).  Prejudice is found where "there

is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." Id. at 694.  A reasonable probability is "a probability

sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112. A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697), amended and superseded on other grounds, 385 F.3d 1247 (9th Cir. 2004); United States v. Ray, No. 2:11-cr-0216-MCE, 2016 WL 146177, at *5 (E.D. Cal. Jan. 13, 2016) (citing Pizzuto, 280 F.3d at 954).

For the reasons stated in the prior section, petitioner cannot show he was prejudiced by his counsel's failure to object. Because the evidence that the victim offered to take a polygraph examination was so brief and its subject so limited, there is no reasonable probability that had the evidence been excluded, the result of the proceeding would have been different. Accordingly, petitioner's ineffective assistance of counsel claim fails.

## IV.     Instructional Error

Petitioner argues that the instruction given at trial regarding aider and abettor liability misled jurors and violated his rights to procedural and substantive due process.   (Pet. (ECF No. 1 at 44-47).)

Petitioner challenges jury instruction CALCRIM No. 400.  The trial court instructed the jury as follows:

> A person may be guilty of a crime in two ways:
>
> One, he or she may have directly committed the crime. I would call that person the perpetrator.
>
> Two, he or she may have aided and abetted the perpetrator who directly committed the crime.
>
> A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator.

 (3 RT 656.)

////

22

Petitioner contends the trial court erred in so instructing the jury because the final paragraph of the instruction "suggests that an aider and abettor is vicariously responsible for the intent as well as the acts of the perpetrator and is equally guilty with the direct perpetrator." In state court, petitioner primarily challenged the instruction on state law grounds. (See ECF No. 1 at 44-46.) Petitioner's federal law claims were based on these state law errors. First, petitioner argues that "[t]o the extent that it misstates the intent element for aiding and abetting, CALCRIM No. 400 violates the federal constitution's guarantee of Procedural Due Process and the right to jury trial." (Id. at 46 (citing Strickland, 466 U.S. at 684-85).) Second, petitioner argues that to the extent the instruction violates state law, it violates his substantive due process rights.

## A. Applicable Law

In general, a challenge to jury instructions does not state a federal constitutional claim. Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); Engle v. Isaac, 456 U.S. 107, 119 (1982); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). To warrant federal habeas relief, a challenged jury instruction cannot be "merely . . . undesirable, erroneous, or even 'universally condemned,'" but must violate "some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973); see also Estelle, 502 U.S. at 72 (holding that to find constitutional error, there must be a "'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution" (quoting Boyde v. California, 494 U.S. 370, 380 (1990))); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).

To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'" Prantil v. California, 843 F.2d 314, 317 (9th Cir.1988) (quoting Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)); see also Middleton v. McNeil, 541 U.S. 433, 437 (2004) ("If the charge as a whole is ambiguous, the question is whether there 'is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (quoting Estelle, 502 U.S. at 72)); Henderson v. Kibbe, 431 U.S. 145, 156–57 (1977). In making this determination, the challenged jury instruction "'may not be judged in artificial isolation,' but must be considered in the context

23

of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147); see also Prantil, 843 F.2d at 317 (The habeas court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984))).

Even if constitutional instructional error has occurred, a petitioner is not entitled to federal habeas relief unless the error "in the whole context of the particular case, had a substantial and injurious effect or influence on the jury's verdict." Calderon v. Coleman, 525 U.S. 141, 147 (1998) (citing Brecht, 507 U.S. at 637-38); see also California v. Roy, 519 U.S. 2, 6 (1996); Cavitt v. Cullen, 728 F.3d 1000, 1010 (9th Cir. 2013).

**B. State Court Decision**

> The trial court instructed the jury in the language of CALCRIM No. 400 as follows: "A person may be guilty of a crime in two ways: [¶] One, he or she may have directly committed the crime. I would call that person the perpetrator. [¶] Two, he or she may have aided and abetted the perpetrator who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (Italics added.) Garrett contends the trial court erred in so instructing the jury because the italicized portion of the instruction "suggests that an aider and abettor is vicariously responsible for the intent as well as the acts of the perpetrator and is equally guilty with the direct perpetrator." He further asserts that the error was exacerbated by the prosecutor's statement that an aider and abettor is "just as guilty as" the perpetrator. Again, we are not persuaded.
>
> Garrett bases his contentions on *People v. Nero* (2010) 181 Cal.App.4th 504, 514 (*Nero*), which found that an aider and abettor can be found guilty of a crime lesser than the crime committed by the perpetrator, and thus, an earlier version of CALCRIM No. 400 that stated that " ' "[a] person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it" ' " was misleading. (*Nero*, *supra*, at p. 517.)
>
> The word "equally" has since been removed from CALCRIM No. 400, which now reads in pertinent part: "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." The jury in this case was instructed with the current version of CALCRIM No. 400. Even assuming, as Garrett claims, that, as amended, CALCRIM No. 400 could be interpreted as suggesting that an aider and abettor is vicariously responsible for the intent and the acts of the direct perpetrator and are equally guilty as the direct perpetrator, we find there is no chance the jury was misled here. Reviewing the instructions as a whole, as we must (*People v. Whisenhunt* (2008) 44 Cal.4th 174,

24

220), we find no "reasonable likelihood that the instruction [on aider and abettor liability] caused the jury to misconstrue or misapply the law." (*People v. Thornton* (2007) 41 Cal.4th 391, 436).

Immediately after instructing the jury in the language of CALCRIM No. 400, the trial court instructed the jury in the language of CALCRIM No. 401 as follows: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] One, the perpetrator committed the crime. [¶] Two, the defendant knew ... the perpetrator intended to commit the crime; and [¶] Three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing that crime; and [¶] Four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." The additional instructions clarified any possible ambiguity concerning the intent required for Garrett to be convicted as an aider and abettor. In particular, CALCRIM No. 401 ensured that the jury understood that to find Garrett guilty as an aider and abettor, they had to conclude that he knew Hamilton and the other men intended to force C.G. to orally copulate them and that Garrett himself intended to aid and abet in the commission of those forcible oral copulations.[fn] Accordingly, the trial court properly instructed the jury on aider and abettor liability.

> [fn] Because we conclude the jury was properly instructed with CALCRIM No. 400, we need not consider Garrett's claim that his trial counsel was ineffective in failing to object to the giving of that instruction.

*Hamilton*, 2013 WL 3961167, at *10.

### C. Analysis of Instructional Error Claim

Initially, petitioner's due process arguments based on violations of state law must fail because the state court did not find the instruction violated state law. This court is bound by the state court's determination of its own laws. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); see also Mullaney v. Wilbur, 421 U.S. 684, 691 (1975) ("state courts are the ultimate expositors of state law").

On its face, CALCRIM No. 400 does not explicitly state that an aider and abettor bears equal responsibility as the perpetrator of a crime nor does it impute the perpetrator's intent to the aider

////

25

and abettor. Further, and as discussed by the Court of Appeal, any ambiguity in CALCRIM No.

400 was clarified in the following instruction.

After providing the jury with CALCRIM No. 400, the court instructed:

> To prove that the defendant is guilty of a crime based on aiding and
> abetting that crime, the People must prove that:
>
> One, the perpetrator committed the crime.
>
> Two, the defendant knew in [sic] the perpetrator intended to
> commit the crime; and
>
> Three, before or during the commission of the crime the defendant
> intended to aid and abet the perpetrator in committing that crime;
> and
>
> Four, the defendant's words or conduct did in fact aid and abet the
> perpetrator's commission of the crime.
>
> Someone aids and abets a crime if he or she knows of the
> perpetrator's unlawful purpose, and he or she specifically intends to
> and does in fact aid, facilitate, promote, encourage, or instigate the
> perpetrator's commission of that crime.

(3 RT 656-57.)

The jury was informed that an aider and abettor is liable only based on the specific intent to

aid and abet. Petitioner fails to show CALCRIM No. 400, when taken in context, was erroneous,

much less that it rendered his trial fundamentally unfair.

## V.    Prosecutorial Misconduct

Twice during his closing argument, and once in rebuttal, the prosecutor stated that "you are

just as guilty as an aider and abett[o]r, as you would be if you are the perpetrator."  (2 RT 553;

see also 2 RT 567; 3 RT 639.)  Petitioner contends the prosecutor misstated the law and jurors

would infer that an aider and abettor is vicariously responsible for the intent of the perpetrator.

(Pet. (ECF No. 1 at 47-48).)

### A.  Applicable Law

A criminal defendant's due process rights are violated when a prosecutor's misconduct

renders a trial fundamentally unfair.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  Claims of

prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to

determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the

26

resulting conviction a denial of due process.'"  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir.

1995) (citation omitted); see also Greer v. Miller, 483 U.S. 756, 765 (1987); Donnelly, 416 U.S.

at 643; Towery v. Schriro, 641 F.3d 300, 306 (9th Cir. 2010).  Relief on such claims is limited to

cases in which the petitioner can establish that prosecutorial misconduct resulted in actual

prejudice.  Darden, 477 U.S. at 181-83; see also Towery, 641 F.3d at 307 ("When a state court

has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not

grant habeas relief unless the state court's determination is objectively unreasonable.").

Prosecutorial misconduct violates due process when it has a substantial and injurious effect or

influence in determining the jury's verdict.  See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th

Cir. 1996); see also Brecht, 507 U.S. at 630-32.

   "Improper argument does not, per se, violate a defendant's constitutional rights."  Jeffries v.

Blodgett, 5 F.3d 1180, 1191 (9th Cir. 1993) (citing Darden, 477 U.S. at 181).  When considering

claims of prosecutorial misconduct involving allegations of improper argument, the court must

examine the likely effect of the statements in the context in which they were made and determine

whether the comments so infected the trial with unfairness as to render the resulting conviction a

denial of due process.  Darden, 477 U.S. at 181-83; Donnelly, 416 U.S. at 643; Turner v.

Calderon, 281 F.3d 851, 868 (9th Cir. 2002).

   In fashioning closing arguments, prosecutors are allowed "reasonably wide latitude," United

States v. Birges, 723 F.2d 666, 671-72 (9th Cir. 1984), and are free to argue "reasonable

inferences from the evidence," United States v. Gray, 876 F.2d 1411, 1417 (9th Cir. 1989).  See

also Ducket v. Godinez, 67 F.3d 734, 742 (9th Cir. 1995).  "[Prosecutors] may strike 'hard

blows,' based upon the testimony and its inferences, although they may not, of course, employ

argument which could be fairly characterized as foul or unfair."  United States v. Gorostiza, 468

F.2d 915, 916 (9th Cir. 1972).  "[I]t 'is not enough that the prosecutors' remarks were undesirable

or even universally condemned.'"  Darden, 477 U.S. at 181 (citation omitted).  The issue is

whether the "remarks, in the context of the entire trial, were sufficiently prejudicial to violate

[petitioner's] due process rights."  Donnelly, 416 U.S. at 639; United States v. Robinson, 485 F.

25, 33 (1988) ( "[P]rosecutorial comment must be examined in context . . . .").

27

**B.  State Court Decision**

> [W]e reject Garrett's claim that the prosecutor misstated the law on
> aiding and abetting liability during his closing and rebuttal
> arguments.  During his closing and rebuttal arguments, the
> prosecutor told the jury that an aider and abettor is "just as guilty
> as" a direct perpetrator. In each case, however, the prosecutor went
> on to explain that someone aids and abets a crime if he knows of
> the perpetrator's unlawful purpose and intends to, and does in fact,
> aid, facilitate, promote, encourage, or instigate the perpetrator's
> commission of that crime. Thus, when considered in context, there
> is no reasonable likelihood the jury understood the prosecutor's
> remarks as stating that an aider and abettor is vicariously
> responsible for the intent as well as the acts of the perpetrator and is
> equally guilty with the direct perpetrator, as Garrett claims.
> Furthermore, the trial court instructed the jury to "follow the law as
> I explain it to you" and "[i]f you believe that the attorneys'
> comments on the law conflict with my instructions, you must
> follow my instructions," and we assume the jury followed the
> instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

Hamilton, 2013 WL 3961167, at *11.

**C.  Analysis of Prosecutorial Misconduct Claim**

Taken in context, as the Court of Appeal did, the prosecutor's statements did not infect the

trial with unfairness.  In each of the three instances in which the prosecutor made an "equally

guilty" comment, he went on to describe the law on aider and abettor liability.  In the first

instance, the prosecutor discussed the difference between a perpetrator and an aider and abettor.

He described the perpetrator as the one being orally copulated and the others who are "laughing,"

"cheering," and "encouraging," as the aiders and abettors.  (2 RT 553.)  He described the

activities of the aiders and abettors as being "actively involved in terms of doing the language that

the law contemplates."  (2 RT 554.)  He then specifically described aiding and abetting liability as

one who "knows the perpetrator's unlawful purpose" and "[s]pecifically intends to and does in

fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

(Id.)

In the second instance, the prosecutor's entire statement was that "considering the laws of

aiding and abetting, we know that if a person is there and is in any way encouraging what is going

on in that bathroom, he is just as guilty as the person that's perpetrating that crime."  (2 RT 567.)

////

Finally, the prosecutor's third reference also made clear that the intent required for aiding and abetting liability was not vicarious but was a specific intent.

> [O]ne of them is forcing the victim to orally copulate him and . . . we know that the people that are in that bathroom while this is going on, that have been cheering and making comments and laughing and joking and basically acting as a pack, have all had knowledge of the perpetrator's intent. They have intended to somehow help, facilitate, encourage. By their presence, by their conduct, they have encouraged this conduct to continue.
>
> Under the letter of the law, they are classic aiders and abett[o]rs, and they are just as guilty as the perpetrator of the crime.

(3 RT 639.)

In each instance, the prosecutor described the intent finding necessary for aider and abettor liability. The prosecutor's statements would not have mislead the jury into believing they could impute the perpetrator's intent to the aiders and abettors. The state court's rejection of petitioner's prosecutorial misconduct claim was not contrary to, or an unreasonable application of, clearly established federal law.

## VI. Unreliable DNA Evidence

DNA evidence was the only evidence directly linking petitioner to the crime. Petitioner argues that DNA evidence was unreliable because the DNA experts disagreed over one aspect of co-defendant Hamilton's DNA profile. (Pet. (ECF No. 1 at 48-53).)

The legal standards for considering a claim that the admission of evidence at trial violated due process are stated above. To summarize, petitioner must show the evidence "is almost entirely unreliable," and that it rendered the trial "fundamentally unfair." See Holley, 568 F.3d at 1101. The factual background for this claim is described in the decision of the Court of Appeals.

### A. State Court Decision

#### The DNA Evidence Is Not Unreliable

> Garrett also claims that the judgment must be reversed because "it rests on unreliable DNA evidence." As we shall explain, there is no evidence to support Garrett's charge.
>
> The prosecution's DNA expert Angelynn Shaw testified that Garrett's DNA profile was found in five different areas on C.G.'s body and clothing, namely her tank top, left arm, back, and two

29

stains on her jeans. Garrett's DNA profile was estimated to occur at random in one in one sextillion of the African–American population; one in one hundred sextillion of the Caucasian population; and one in two hundred and seventy sextillion of the Hispanic population.

Defense expert Nikki Sewell, a colleague of Shaw's, reviewed Shaw's findings and obtained the same profiles for Garrett and Hamilton. Sewell did not disagree with any of Shaw's findings pertaining to Garrett, including Shaw's findings that Garrett's DNA profile matched the DNA samples taken from C.G. Sewell did, however, disagree that Hamilton's profile included a tri-allele in the form of a 24 at location D2. Sewell noted that tri-alleles are difficult to diagnose and subject to interpretation by the analyst within lab guidelines. Sewell determined that the 24 at location D2 was high stutter, while Shaw analyzed it as a tri-allele. Sewell did not think either interpretation was incorrect because lab protocol granted leeway as to whether to analyze the 24 at location D2 as high stutter or an actual allele peak. Sewell's determination that the 24 at location D2 was high stutter as opposed to a tri-allele does not in any way undermine Shaw's findings concerning Garrett's DNA profile, with which Sewell agreed.

There is no evidence to support Garrett's charge that the DNA evidence upon which his convictions are based is unreliable.

Hamilton, 2013 WL 3961167, at *11.

**B.  Analysis of Claim of Unreliable DNA Evidence**

Both the prosecution and defense experts at trial agreed that the DNA samples taken from the victim in five different locations matched the profile for petitioner.  The fact that there was one source of disagreement between the experts regarding Hamilton's profile does not reasonably lead to a conclusion that the entire science of DNA evidence was so unreliable as to violate due process.  Moreover, petitioner presented no evidence to the state court by way of a habeas petition, or otherwise, to show that the DNA evidence that inculpated him was in any way incorrect.  Petitioner fails to show the DNA evidence rendered his trial fundamentally unfair.

**VII.    Ineffective Assistance of Counsel for Failing to Move for Separate Trial or Jury**

Petitioner's final argument is that his trial counsel erred by failing to move for a trial separate from that of co-defendant Hamilton.  According to petitioner, the jury heard hearsay statements from Hamilton that contained "false denials and admissions related to this case, as well as nasty, inflammatory, derogatory expletive-laced comments by Hamilton and paramour Jasmine H. regarding [the victim]."  Had petitioner been tried alone, none of these statements would have

been admitted.  Petitioner states that the court's brief limiting instruction that admissions and false statements about the crime applied only to Hamilton, did not "remedy the situation."  (ECF No. 1 at 53.)

## A.  State Court Decision

Garrett's Trial Counsel Was Not Ineffective for Failing to Move for a Separate Trial or Jury

Finally, Garrett contends that his trial counsel provided ineffective assistance by failing "to move for a separate trial or separate jury to avoid jury exposure to the recordings of Hamilton's hearsay statements." According to Garrett, the "[j]oint trial resulted in the jury ... hearing Hamilton's hearsay statements to detectives and statements during jail telephone calls making false denials and admissions related to this case, as well as nasty, inflammatory, derogatory expletive-laced comments by Hamilton and paramour Jasmine Hall regarding [C.G.]" As we shall explain, it was not reasonably probable that a different outcome would have ensued absent the alleged error.

Officer Willover interviewed Hamilton while he was in custody. During the interview, Hamilton identified C.G. from a photograph and acknowledged that he knew her. He said they were close friends and had consensual sex one year earlier. He repeatedly denied engaging in any nonconsensual sexual act with C.G. or engaging in any sexual act with C.G. when she was a minor. He also denied ever going by the name "Chris." He said C.G. was lying if she accused him of forcible sexual conduct with her. He did not recall an incident in a park restroom with C.G. but said that if such an incident did occur it was consensual.

After being interviewed by Officer Willover, Hamilton telephoned his girlfriend and prevailed upon her to make a three-way call to C.G. Before doing so, Hamilton told his girlfriend that C.G. had accused him of raping her, and both he and his girlfriend repeatedly referred to C.G. as a "bitch." During the three-way call with C.G., Hamilton told C.G. that the police told him that she had accused him of rape, and C.G. denied making such an accusation. C.G. told Hamilton that he and "three other dudes" took her to a park "and you all had me give you ass and then you all left me up there." Hamilton said that he did not remember any such incident. C.G. told Hamilton that the incident occurred in the summer of 2000. Hamilton said he recalled going to the movie with Cameo but that was it. C.G. told Hamilton that she knew him as "Chris" but did not associate him with the incident in the restroom until recently. C.G. also said that she did not know how Hamilton could not remember the incident and explained, "It done messed me up share." Hamilton asked if he forced her to do anything, and C.G. responded that she did not want to do it.

To prevail on his ineffective assistance of counsel claim, defendant must show his counsel's representation fell below an objective

standard of reasonableness and, but for counsel's error, there is a reasonable probability of a more favorable outcome. (*See Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 693–694 [80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 215–218.) Where, as here, a claim of ineffective assistance of counsel is based on trial counsel's failure to make a motion or objection, the defendant must demonstrate not only the absence of a tactical reason for the omission, but also that the motion or objection would have been meritorious if the defendant is to bear his burden of demonstrating that it is reasonably probable that absent the omission a determination more favorable to defendant would have resulted. (*People v. Fosselman* (1983) 33 Cal.3d 572, 584; *Strickland v. Washington*, supra, 466 U.S. at p. 696 [80 L.Ed.2d at p. 699].)

Here, Garrett makes no attempt to establish that a motion for a separate trial or separate jury would have been meritorious. Thus, he has failed to meet his burden of demonstrating it is reasonably probable that absent the omission a determination more favorable to him would have resulted.

Even assuming one of the motions would have been granted, the state of the evidence is such that it is not reasonably probable that a more favorable outcome would have ensued had separate trials been held or separate juries empaneled. Garrett was not mentioned during any of the conversations. Hamilton did not admit to forcing C.G. to orally copulate him or aiding and abetting anyone else in doing so. To the contrary, he denied ever forcing C.G. to do anything and said that while he did not remember any incident in a park restroom, if such an incident did occur, it was consensual. Hamilton admitted going to a movie with Cameo during the relevant time period, thereby suggesting that he was the person C.G. knew as Chris. However, his admission did not implicate Garrett in any way. C.G.'s statements to Hamilton were consistent with her testimony at trial. As the prosecutor told the jury, "what you can do is you can listen to those calls and see how they corroborate, how they give support, how they line up really with what [C.G.] testified to when she was in court." C.G.'s statements to her mother, brother's girlfriend, Johnson, and Miyamoto were also consistent with her statements to Hamilton, i.e., that she was forced to orally copulate four men in a park restroom.

We conclude that where, as here, Hamilton's incriminating statements do not implicate Garrett in the crimes charged, C.G.'s statements are merely cumulative, and the properly admitted evidence (namely the presence of Garrett's DNA on five places on C.G.'s body and clothing) is overwhelming, it is not reasonably probable that a different outcome would have ensued absent the alleged error.

Accordingly, Garrett has failed to meet his burden of establishing that his trial counsel rendered ineffective assistance.

<u>Hamilton</u>, 2013 WL 3961167, at *11-12.

*////*

### B. Analysis of Ineffective Assistance Claim re Separate Trials

Like the prior claim of ineffective assistance of counsel, this claim can be resolved by looking solely at whether prejudice has been established. As described above, petitioner was only prejudiced by an error of counsel if there is a "reasonable probability" that absent the error, the result of the proceedings would have been different. Prejudice is only possible if, had counsel made the motion, the motion would have been granted. Petitioner makes no attempt to make that showing. Under California law, trial courts should sever co-defendants' cases "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony. People v. Turner, 37 Cal. 3d 302, 312 (1984) (quoting People v. Massie, 66 Cal. 2d 899, 917 (1967) (footnotes omitted)), overruled on other grounds in People v. Anderson, 43 Cal. 3d 1104 1115 (1987)).

Petitioner argues the association with co-defendant Hamilton was prejudicial. However, as explained by the Court of Appeal, none of Hamilton's out-of-court statements implicated petitioner or referred to petitioner in any way. The only possible effect on petitioner of the jury hearing these statements was some sort of "spill-over" effect of what was basically character evidence against Hamilton – that he swore and called the victim a "bitch." Petitioner states that jurors could have attributed some of that language and attitude to him based on the fact the men appeared to be hanging out in a group. Any such attribution is too attenuated to support a finding of prejudice, particularly given the deference due the state court's rejection of this claim. Accordingly, petitioner's claim that his trial attorney was ineffective for failing to move for separate trials or juries should fail.

### CONCLUSION

Petitioner has failed to establish that the decision of the California Court of Appeal rejecting his claims was contrary to, or an unreasonable application of, clearly established federal law or was an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). Because petitioner has not satisfied the requirements of § 2254(d), IT IS HEREBY RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991). In the objections, the party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed. See Rule 11, Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated: August 3, 2017

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DLB1/prisoner-habeas/garr1973.fr

34